FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Feb 26, 2025

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

SHELLY B.,[1]

                    Plaintiff,

        v.

LELAND DUDEK, Acting
Commissioner of Social Security,[2]

                    Defendant.

No.    2:24-cv-00303-EFS

**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR FURTHER PROCEEDINGS**

Due to right shoulder labral tear and supraspinatus tear, mild arthritic changes of the shoulder, bipolar disorder, anxiety disorder, depression, substance

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." *See* LCivR 5.2(c).

[2] Leland Dudek was named the Acting Commissioner of Social Security on February 17, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, and section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), he is hereby substituted as the defendant.

addiction, and bilateral carpal tunnel syndrome, Plaintiff Shelly B. claims that she is unable to work fulltime and applied for disability insurance benefits and supplemental security income benefits. She appeals the denial of benefits by the Administrative Law Judge (ALJ) on the grounds that the ALJ improperly analyzed the medical opinions of record, that the ALJ erred in finding that her bilateral carpal tunnel syndrome was not a severe impairment prior to July 12, 2023, and that the ALJ erred in his consideration of Plaintiff's subjective complaints.  As is explained below, the ALJ erred in his consideration of the medical opinions.   This matter is remanded for further proceedings.

# I.    Background

On November 12, 2018, Plaintiff filed an application for benefits under Title 16, and on December 11, 2018, she filed an application for benefits under Title 2, with both claiming disability beginning April 2, 2017, based on the mental and physical impairments noted above.[3] Plaintiff's claims were denied at the initial and reconsideration levels.[4]  On September 13, 2021, after the agency denied Plaintiff benefits, ALJ Chris Stuber held a telephone hearing, at which Plaintiff appeared with her representative and testified.[5]  A vocational expert also appeared and

---

[3] AR 764-772, 773-774, 775-780, 894.

[4] AR 337-345, 352-358, 359-365.

[5] AR 68-85.

1    testified.[6]  On September 24, 2021, ALJ Stuber issued a decision denying Plaintiff's

2    claims.[7] On September 20, 2022, the Appeals Council remanded the case for

3    further proceedings and a new sequential evaluation.[8]

4        On September 6, 2023, Plaintiff and her attorney appeared via telephone for

5    a hearing before ALJ Glenn Meyers.[9] Plaintiff testified and a vocational expert

6    testified.[10] On October 11, 2023, ALJ Meyers issued a decision denying Plaintiff's

7    claims.[11] On November 30, 2023, the Appeals Council remanded the case for the

8    ALJ to consider additional medical records and make a new finding at step five.[12]

9        On April 9, 2024, Plaintiff attended a second hearing via telephone before

10   ALJ Meyers.[13] Plaintiff testified and a vocational expert testified.[14] On May 1,

11

12

13   _____

14   [6] *Id.*

15   [7] AR 258-286.

16   [8] AR 287-292.

17   [9] AR 86-132.

18   [10] *Id.*

19   [11] AR 295-326.

20   [12] AR 327-333.

21   [13] AR 133-170.

22   [14] *Id.*

23

DISPOSITIVE ORDER - 3

2024, the ALJ issued a partially favorable decision that found Plaintiff to be disabled since July 1, 2023, but denied the portion of claim prior to that date.[15]

The ALJ found that for the relevant period prior to July 1, 2023, Plaintiff's alleged symptoms were not entirely consistent with the medical evidence and the other evidence.[16] As to medical opinions, the ALJ found:

- The opinions of state agency evaluators J.D. Fitterer, MD, and Howard Platter, MD, regarding Plaintiff's physical limitations to be somewhat persuasive.

- The October 2019 opinions of Anne Koomen, ARNP, regarding Plaintiff's physical limitations to be unpersuasive.[17]

- The opinions of Brittany Yahruas, PA-C, regarding Plaintiff's ability to work from an orthopedic standpoint to be "more persuasive."

- The opinions of Lauren Kate Ballou, ARNP, regarding Plaintiff's physical limitations to be persuasive as to temporary limitations.

- The opinions of Curt Haugen, PA-C, regarding Plaintiff's physical limitations to be somewhat persuasive.

---

[15] AR 15-53.

[16] AR 25-27.

[17] Due to an apparent typographical error the decision states that the opinion is persuasive but then goes on to describe the ways in which it is unpersuasive.

- The opinions of Patricia Burbank, ARNP, regarding Plaintiff's physical limitations to be unpersuasive.

- The opinions of state agency evaluators Christmas Covell, PhD, and Michael Regets, PhD, to generally persuasive.

- The opinions of consultative examiner Alexander Patterson, PsyD, to be persuasive as to the two days in April 2019 and May 2019 that Plaintiff was psychotic.

- The opinions of Anne Koomen, ARNP, regarding Plaintiff's mental limitations to be somewhat persuasive.

- The opinions of Patricia Burbank, ARNP, regarding Plaintiff's mental limitations to be unpersuasive.

- The opinions of Elizabeth Buck, MD, to be somewhat persuasive.

- The opinions of Douglas Uhl, PhD, to be unpersuasive.[18]

The ALJ also considered the testimony of Plaintiff's ex-sister-in-law, Patricia W.[19]

As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2024.

- Plaintiff had not engaged in substantial gainful activity since April 2, 2017, the alleged onset date.

---

[18] AR 28-332.

[19] AR 32.

- Step two: Plaintiff had the following medically determinable severe impairments: right shoulder labral tear and supraspinous tear; mild arthritic changes of the shoulder; bipolar disorder; anxiety; depression; substance addiction (drugs); and substance addiction (alcohol). Beginning on the established onset date of disability, July 1, 2023, the claimant has had the following severe impairments: carpal tunnel syndrome.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments with consideration of Listings 1.14, 1.18, 11.14, 12.04, and 12.06.

- RFC:  Plaintiff had the RFC prior to July 1, 2023, to perform light work with the following exceptions:

  [Plaintiff] could engage in no overhead reaching, but frequent reaching at or below shoulder level. [Plaintiff] could frequently handle and finger. [Plaintiff] could occasionally stoop, but she could not crouch, crawl, kneel, or climb ramps, stairs, ropes, ladders, and scaffolds. [Plaintiff] could not work at heights or in proximity to hazardous conditions. [Plaintiff] could understand, remember, and carry out simple instructions and tasks. [Plaintiff] could use judgment to make simple work-related decisions. [Plaintiff] could not perform work requiring a specific production rate (such as assembly line work) or work that requires hourly quotas. [Plaintiff] could only deal with rare changes in the work setting.

- RFC:  Plaintiff had the RFC since July 1, 2023, to perform light work with the following exceptions:

  [Plaintiff] can engage in no overhead reaching and occasional reaching at or below shoulder level. [Plaintiff] can occasionally

handle and finger. [Plaintiff] can occasionally stoop, but she cannot crouch, crawl, kneel, or climb ramps, stairs, ropes, ladders, and scaffolds. [Plaintiff] cannot work at heights or in proximity to hazardous conditions. [Plaintiff] can understand, remember, and carry out simple instructions and tasks. [Plaintiff] can use judgment to make simple work-related decisions. [Plaintiff] cannot perform work requiring a specific production rate (such as assembly line work) or work that requires hourly quotas. [Plaintiff] can only deal with rare changes in the work setting.

- Step four: Plaintiff is unable to perform her past relevant work as a hospital admitting clerk, hospital cleaner, sandwich server, housekeeping cleaner, and home attendant.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as a marker (DOT 209.587-034), a housekeeping cleaner (DOT 323.687-014), and a router (DOT 222.587-038).[20]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and on July 15, 2024, the Appeals Council denied review.[21]  Plaintiff then timely appealed to this Court.[22]

---

[20] AR 20-35.

[21] AR 592-594, 2-7.

[22] ECF No. 1.

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error,"[23] and such error impacted the nondisability determination.[24] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[25]

## III.    Analysis

Plaintiff seeks relief from the denial of disability on three grounds. She argues the ALJ erred when evaluating the medical opinions, erred in finding that

_____

[23] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[24] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

[25] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

her carpal tunnel syndrome was not a severe impairment prior to July 1, 2023, and erred in her assessment of Plaintiff's testimony.[26]  As is explained below, the Court concludes that the ALJ consequentially erred in his evaluation of the medical opinion evidence.

**A.    Medical Opinions: Plaintiff establishes consequential error**

Plaintiff argues the ALJ erred in his evaluation of the medical opinions regarding both Plaintiff's mental impairments and physical impairments.[27] Plaintiff argues that the ALJ improperly rejected all or a portion of the opinions of ARNP Koomen and ARNP Burbank.[28] Plaintiff argues that the ALJ erred when considering that ARNP Koomen's opinion was not consistent with PA-C Yahruas' opined limitations because PA-C Yahruas considered only Plaintiff's physical impairments. and that he erred in finding ARNP Koomen's opinions not consistent with the longitudinal record. The Commissioner counter argues that the ALJ properly considered PA-C Yahruas's opinions because ARNP Koomen opined as to

---

[26] Plaintiff also argues that the ALJ's finding at step five is flawed as a result of his errors in evaluating the medical opinions and his subjective testimony.

[27] An ALJ must consider and articulate how persuasive she found each medical opinion, including whether the medical opinion was consistent with and supported by the record. 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

[28] ECF No. 8.

both Plaintiff's physical and mental limitations.[29]  Plaintiff also alleges that the ALJ failed to consider both subjective and objective findings in the record consistent with ARNP Burbank's opinions.[30]  The Commissioner asserts that the ALJ reasonably rejected ARNP Burbank's opinions.[31]

　　1.　Standard

　　The ALJ was required to consider and evaluate the persuasiveness of the medical opinions and prior administrative medical findings.[32] The factors for evaluating the persuasiveness of medical opinions and prior administrative medical findings include, but are not limited to, supportability, consistency, relationship with the claimant, and specialization.[33] Supportability and consistency are the most important factors,[34] and the ALJ must explain how he considered the supportability and consistency factors when reviewing the medical opinions and support her explanation with substantial evidence.[35] The ALJ may consider, but is

---

[29] ECF No. 9.

[30] ECF No. 8.

[31] ECF No. 9.

[32] 20 C.F.R. §§ 404.1520c(a), (b), 416.920c(a), (b).

[33] *Id.* §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)–(5).

[34] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2).

[35] *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785 ("The agency must articulate . . . how persuasive it finds all of the medical opinions from

not required to discuss the following additional factors: the source's relationship to Plaintiff such as length of the treatment, purpose of the treatment relation and whether the source examined Plaintiff, as well as whether the source had advanced training or experience to specialize in the area of medicine in which the opinion was being given.[36] When considering the ALJ's findings, the Court is constrained to the reasons and supporting explanation offered by the ALJ.[37]

2. <u>Relevant Medical Records</u>

On July 10, 2019, Sarah Lewis, DO, of Peninsula Behavioral Health examined Plaintiff and noted that Plaintiff presented with reports that she had been experiencing psychosis which subsided after the medication Lurasidone was added to her existing medications of Lamotrigine, Bupropion, and Buspirone one and a half weeks prior.[38] Dr. Lewis noted that in the past there had been failed trials of Lithium, Geodon, Depakote, Trazadone, Lexapro, and Prozac.[39] Dr. Lewis

---

each doctor or other source and explain how it considered the supportability and consistency factors in reaching these findings.") (cleaned up).

[36] *Id.*

[37] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (recognizing court review is constrained to the reasons the ALJ gave).

[38] AR 1671.

[39] *Id.*

diagnosed bipolar disorder, current episode manic severe with psychotic features, moderate stimulant use disorder, and moderate opioid use disorder.[40]

On July 12, 2019, Plaintiff was examined by Alexander Patterson, PsyD, at the request of an attorney representing her in a criminal matter to determine if her actions were influenced by mental disease.[41] Charging documents indicated that Plaintiff had taken items out of restaurant and was rolling tables down the hill because "God told her to," that the police had initially responded to a report that Plaintiff was contacting her boyfriend in violation of a protective order, and that she resisted being detained and kicked a police officer while being searched.[42] Dr. Patterson indicated that he examined Plaintiff for approximately 90 minutes.[43] A police report indicated that on April 14, 2019, when confronted while disposing of furniture and items at a restaurant, Plaintiff told police that God told her to because the restaurant had the word devil it its name.[44] A separate police report indicated that on May 16, 2019, an officer was called based on a report that Plaintiff violated a protective order.[45] Plaintiff had shaved her head, and was

---

[40] AR 1675.

[41] AR 1678.

[42] *Id.*

[43] AR 1979.

[44] AR 1680.

[45] *Id.*

wearing camouflage and had allegedly followed a woman after making contact with her boyfriend because "God told her to."[46] Plaintiff resisted arrest and kicked the officer.[47]

Plaintiff reported to Dr. Patterson that she had a mental breakdown in 2015 and moved to the area, and had lived with her sister-in-law but became homeless and had a boyfriend but he could not handle her psychosis.[48] She reported being in special education in elementary school and barely graduating high school due to PTSD.[49] She abused prescribed opioids after a 2009 surgery and entered a suboxone program from 2013 through 2015 and had a breakdown 2 weeks after leaving the program.[50] She reported that for one week in 2015 she ran down the street naked, slept very little, lost weight, and had delusions that she had a black Camaro, knew the Kardashians, and was going to be a police officer.[51] She was arrested after hitting someone with her car and was in jail, where she was stabilized until she became manic in 2018 and acutely manic in 2019 after her

---

[46] *Id.*

[47] AR 1680-1681.

[48] AR 1681.

[49] AR 1882.

[50] *Id.*

[51] AR 1682-1883.

DISPOSITIVE ORDER - 13

1  release from jail.[52] She reported that her symptoms improved when she started

2  taking Lurasidone 5 days prior to the interview.[53]

3      On mental status examination, she was groomed, had good eye contact, had

4  no psychomotor agitation, was cooperative, and did not seem to display

5  hallucinations or delusions.[54] Plaintiff's mood was mildly elevated, her speech was

6  fast and loud, her facial expressions were dramatic, she seemed nervous, and her

7  attention was slightly affected, but she was able to think abstractly and had

8  adequate judgment and insight.[55]  Dr. Patterson diagnosed Bipolar disorder, noting

9  a history of recurrent severe manic episodes lasting two to three days.[56] He

10  indicated that despite stabilization with antipsychotic medication Plaintiff's mood

11  was elevated and she displayed residual mood instability and was vulnerable to

12  decompensation.[57]

13      Dr. Patterson opined that there is strong evidence that Plaintiff was in a

14  manic state from April 2019 up to approximately five days prior to the interview.[58]

15

---

16  [52] AR 1683.

17  [53] *Id.*

18  [54] AR 1683-1684.

19  [55] AR 1684.

20  [56] *Id.*

21  [57] AR 1685.

22  [58] AR 1687.

23

He opined that on the dates of the violations Plaintiff was in a state of acute mania leading to pervasive delusions and profound detachment from reality.[59] He opined that she was unable to appreciate the nature of her behavior and to tell right from wrong regarding her actions.[60]

On January 29, 2021, Plaintiff was given an initial examination screening by Nicki McCann, RN, after being incarcerated in the Clallam County Jail.[61]  On February 3, 2021, Plaintiff was examined by the county jail staff member Emma Watson, LPC.[62] LPC Watson noted on examination that Plaintiff was untidy, with rapid speech, poor insight, tangential and disorganized thought, and had an angry and anxious affect with tearful mood.[63] LPC Watson assessed Plaintiff as being in an unstable state which was not drug related, with highly emotional dysregulated emotions, thoughts, and behaviors; rapid and severe emotional shifts; and mild delusions and paranoia.[64]  On March 9, 2021, while still incarcerated in the Clallam County Jail, Plaintiff presented to Lindsey Monaghan, MD, requesting an increase in her psychotropic medication and reporting that she was beginning to

---

[59] *Id.*

[60] AR 1688.

[61] AR 2391.

[62] AR 2392.

[63] *Id.*

[64] AR 2393.

feel manic and had been hearing voices.[65] She requested inpatient psychiatric treatment and reported feeling angry and overwhelmed.[66] On examination, Dr. Monaghan noted that on examination Plaintiff had pressured speech, agitated mood and affect, and was tearful at times.[67] Dr. Monaghan increased Plaintiff's Latuda and Lamictal.[68]

On November 21, 2019, Plaintiff presented to Anne Koomen, ARNP, for medication management and noted that her condition had exacerbated over the winter and spring of 2019, and she recently was having delusional thoughts of persecution after stopping Latuda.[69] She also reported that she had started work at Safeway but was experiencing triggers and needed to find other work.[70] At a follow-up appointment with Christine Size, ARNP, Plaintiff was in a manic state with suspicious, hostile, defensive behavior; loud, rapid speech; expensive and irritable mood; persecutory thought content, and paranoia.[71] ARNP Size diagnosed bipolar 1 disorder with psychotic features, most recent manic and severe; moderate

---

[65] AR 2384.

[66] *Id.*

[67] AR 2386.

[68] AR 2387.

[69] AR 2839.

[70] *Id.*

[71] AR 2789-2790.

stimulant use; and moderate opioid use, in sustained remission; and she opined that Plaintiff's use of methamphetamines was exacerbating her symptoms.[72] On November 12, 2020, Plaintiff presented to ARNP Linda Boardman following a recent one-week incarceration, reporting "high anxiety" and requesting Klonopin.[73] On mental status examination, she had anxious mood and affect, rapid speech, circumstantial thought process, and poor/fair insight.[74]

On February 23, 2022, Plaintiff was examined by Kiti Ton, MD of Catholic Charities, Wenatchee for evaluation for treatment.[75] On examination, Dr. Ton noted on examination that Plaintiff was overweight and unkempt; had intermittent eye contact; euthymic mood; and circumstantial thought process.[76] At a follow-up appointment on May 24, 2022, Dr. Ton noted that on examination Plaintiff was overweight and unkempt, had a preoccupied attitude; had normal speech; was euthymic; and had a labile affect and circumstantial thought process.[77] Dr. Ton noted that Plaintiff reported delusional thinking, grandiosity, and hyper religiosity,

---

[72] AR 2790.

[73] AR 2878.

[74] AR 2876, 2878, 2879.

[75] AR 2938.

[76] AR 2941.

[77] AR 2954-2955.

1  and stated that she had been abstinent from drugs for 6 weeks.[78] When seen on

2  May 2, 2023, by agency counselor Adrienne Battee, Plaintiff reported she was

3  staying at the YWCA and reported feeling overwhelmed easily, disoriented, and

4  sleeping excessively.[79] Ms. Battee noted that Plaintiff is known to be aggressive

5  and abusive when not taking her medication.[80] Plaintiff reported at this time that

6  she was in a substance abuse program and remaining abstinent from

7  methamphetamines.[81]

8          On February 26, 2024, Plaintiff was examined by W. Douglas Uhl, PsyD, at

9  the request of the Washington State Department of Social Services.[82] Dr. Uhl

10  stated that in preparation for the examination he reviewed a DSHS intake dated

11  November 15, 2023.[83] Dr. Uhl's report included a detailed clinical interview noting

12  Plaintiff's psychosocial history, medical and mental health treatment history,

13  educational and work history, substance use history, and activities of daily living.[84]

14  Dr. Uhl diagnosed Plaintiff with Post Traumatic Stress Disorder, Bipolar Disorder

---

[78] AR 2957.

[79] AR 2936.

[80] *Id.*

[81] AR 2950.

[82] AR 4181.

[83] *Id.*

[84] AR 4181-4182.

with psychotic features, and an Unspecified Neurocognitive Disorder.[85] Dr. Uhl opined that Plaintiff would have a moderate limitation in the following: performing activities within a schedule, maintaining attendance and being punctual; and being award of hazards.[86] He opined that she would have a marked limitation in the following activities: learning new tasks, adapting to changes in a routine work setting, making simple decisions, asking simple questions or requesting assistance, communicating and performing effectively in a work setting, maintaining appropriate behavior, completing a normal workweek without interruption from psychologically based symptoms, and setting realistic goals and planning independently.[87] He opined that the overall severity of her combined symptoms was marked.[88] On examination, Dr. Uhl noted that Plaintiff had speech that was pressured and hard to understand, an entitled behavior and attitude, labile affect, indications of a possible cognitive impairment, a limited ability to think abstractly, and limited insight and judgment causing difficulty with decision making.[89]

---

[85] AR 4182.

[86] AR 4192.

[87] *Id.*

[88] *Id.*

[89] AR 4193-4194.

3.     <u>Plaintiff's testimony</u>

The Plaintiff appeared and testified at three separate hearings.  The testimony indicates a consistency in her reports about her mental illness and a progression in her physical impairments.

On September 13, 2021, Plaintiff appeared via telephone with her attorney for a hearing before ALJ Chris Stuber.[90]  She testified that she was 50 years old, was able to drive, and graduated from the 12th grade.[91] She said that she was not working and that since the alleged date of disability she worked two months at SAS Retail Merchandising and stocked and arranged shelves in Safeway.[92] She said she worked that job full-time and that the only physical impairment she had was her right shoulder, which flared up if she used her arm for more than 2 hours.[93] When she has a flare up, it is hard to left her shoulder.[94]

Plaintiff testified she was diagnosed with bipolar in 2015 when she had her first mental breakdown and had been on medication since.[95] She is bipolar and her

---

[90] AR 68-96.

[91] AR 72.

[92] AR 73.

[93] AR 73-74.

[94] AR 74.

[95] *Id*.

symptoms cycle between mania and depression.[96] She said that for the last three years she frequently had episodes of psychosis.[97] She said that after her mental breakdown in 2015 she started smoking meth and that she had recently completed treatment for her meth addiction.[98] She said that she believed her public defender was prejudiced against mentally ill people and she was still on probation and subject to drug tests.[99] She said that she had used twice when under stress and that she had been falsely accused of burglary.[100] She said that when she is manic she is not aware of problems and will say her life is good when it is not.[101] When she is depressed, she tries to "push through it," and she is not depressed very often.[102] Plaintiff said she takes Wellbutrin and Lamictal and said that when she takes her medication she is fine but she "gets into trouble" when she does not take it.[103]

---

[96] *Id.*

[97] AR 75.

[98] *Id.*

[99] AR 75-76.

[100] AR 76.

[101] AR 76-77.

[102] AR 77.

[103] AR 77-78.

Plaintiff said she had been looking for work and had called her old employer.[104] Plaintiff testified that she would like to work part-time and thinks that mentally full-time work would be too much for her.[105] She said she is a social person and is homeless and had been staying at a shelter but was able to stay for 14 days per year in her boyfriend's apartment.[106] She said that she does fine mentally when she is in a secure place but that when out in public it is stressful.[107] She said that she goes out with her boyfriend but does not go out a lot but goes to church and to NAA and has a sponsor who she talks to by phone and text.[108]

On September 6, 2023, Plaintiff appeared with her attorney via telephone for a hearing before ALJ Glenn Meyers.[109] She said she was 52 and had a car and a driver's license but only drove about five minutes to the grocery store and back once a week.[110] She said she lived in the YWCA shelter and shared her room with another resident and had access to a shared kitchen.[111] She said she cooks only for

---

[104] AR 78.

[105] AR 79.

[106] AR 80.

[107] *Id.*

[108] AR 81-82.

[109] AR 86-132.

[110] AR 92-93.

[111] AR 93.

herself but is friendly with other residents and will at time give residents a ride or will loan them clothing.[112] She had lived at the YWCA for seven months and was not allowed visitors and had to complete the chores assigned to her.[113] She said the chores should be done daily but if she is not feeling well her friends will help her.[114] She is drug tested weekly and had been clean for seven months and had worked 3 jobs with PeopleReady, as a cleaner or an apple picker at a conveyor belt, but she had to stop because her left wrist, her dominant hand, flared up really bad.[115] She said she had problems with both hands but the left was severe.[116] She said the restoration job was for a month and she had to leave twice because of her hand and could not go back.[117] She said that the job with Waste Management allowed her to refuse days when she was not available.[118] She was able to work for about two months before she had to stop.[119] She worked at the job Monday through Friday and she carried a garbage bag all day and picked up about two bags of garbage a

---

[112] AR 94.

[113] AR 95-96.

[114] AR 96.

[115] AR 97-98.

[116] AR 98.

[117] *Id.*

[118] AR 98-99.

[119] AR 99.

day.[120] She would fill the bag until it was too heavy and then put it down.[121] She said she was not working now because of her wrist issues and was treating with a specialist who performed a conduction study and was discussing surgery.[122] She had been referred to him in August and had the test in July.[123] The doctor had her off work at least until December.[124]

Plaintiff testified that she first had an issue with her wrist in late January when she was working for PeopleReady at the apple sorting job.[125] She said she had been sober since July 17, 2022.[126] She said that since that date her concentration and focus have not improved but that overall her stability is better but that she thought her stability did not have anything to do with drugs.[127] She said that she had lived most of her life clean and sober and her mental health issues are not related to drug use.[128] She said that when she moved into the YWCA

---

[120] AR 100-101.

[121] AR 102.

[122] AR 103.

[123] *Id.*

[124] AR 104.

[125] AR 104-105.

[126] AR 105.

[127] AR 106.

[128] *Id.*

1    she was sober because she had been in jail and taking her medications from July

2    2022 to December 2022.[129] Plaintiff agreed that drugs affected her decision making,

3    that she could voluntarily control her drug use when stable, and that control was

4    more difficult when she was depressed or manic.[130] She said that before her mental

5    breakdown in 2015 she did not have drug issues.[131]

6          Plaintiff said she traveled to California to see her mother but did not

7    remember how she got there.[132] She spent a week there visiting her mother and

8    her son.[133] She has also driven to Port Angeles twice in the year prior to see her

9    grandchild.[134] She has never had problems with the drive and it takes her five and

10   a half hours.[135] She visited for about two weeks and when there she stayed at her

11   sister's house and visited her grandchild.[136]

12

13

14   _____

15   [129] AR 108.

16   [130] AR 109-110.

17   [131] AR 110.

18   [132] AR 111-112.

19   [133] AR 112-113.

20   [134] AR 113.

21   [135] AR 114.

22   [136] AR 115.

23

Plaintiff said she was presently on short-term disability and received $800 a month, as well as $286 in food stamps, and paid $350 in rent.[137] She said that when she has a bad mental health day she does not want to get out of bed.[138] On days she called off work she was in bed most of the day.[139] She sleeps for 8 hours plus daily.[140] She said that the mental illness with mania and drug use was a vicious cycle for 5 years.[141]

Plaintiff said she had trouble reaching with her right arm since an injury a few months prior.[142] She said her last manic episode was before she went to the YWCA but her depression was continual.[143] She goes to sleep by 5:00 pm and sleeps excessively.[144] She thought her medication was not strong enough.[145]

---

[137] AR 115-116.

[138] AR 117.

[139] AR 118.

[140] *Id.*

[141] AR 119-120.

[142] AR 124.

[143] *Id.*

[144] AR 125.

[145] AR 126.

DISPOSITIVE ORDER - 26

On April 9, 2024, Plaintiff appeared with her attorney via telephone for a third hearing, again before ALJ Meyers.[146] When asked if there were any changes in her health since the last hearing, she said that she battled her bipolar on a daily basis, that her left wrist was the same, but that her depression had worsened.[147] She said she had to get a different medication to help with daily functioning but still struggles and has bad days.[148] She said her concentration and focusing have been difficult and that she still does not think that they have found the right medication.[149] She said that Abilify was not helping and that in the last six months she had attended counseling.[150] She said she was no longer living at the YWCA and was in stable housing.[151] She said that she was living alone in stable housing but was still battling with depression and bipolar and that she still had manic behavior and her most recent manic episode had been the month prior.[152] She said that with her manic episodes she sometimes had energy and sometimes she did not.[153] She

---

[146] AR 133-170.

[147] AR 138-139.

[148] AR 139.

[149] *Id.*

[150] AR 139-140.

[151] AR 140.

[152] AR 141.

[153] AR 141-142.

said that on some days she will have energy to make phone calls and on others days she would not.[154] She said she had not felt normal since a mental breakdown in 2015 when she suffered psychosis and that at the time of the hearing she was battling depression.[155]

Plaintiff said she had physical issues that included left and right wrist pain, numbing and cramping, and right shoulder weakness.[156] She said she has a boyfriend who will help her and drive her to the store and to visit her family but he does not live with her.[157] She rarely goes out and has an emotional support dog and she takes him outside but does not walk him every day.[158] She said her boyfriend is receiving social security and suffers from schizophrenia and back pain.[159] She said she cleans "when she can," and cooks on the stove and microwave but rarely cooks in the oven.[160] She said she last left Washington to go to California in 2023 to visit

---

[154] AR 142.

[155] AR 143.

[156] AR 143-144.

[157] AR 144-145.

[158] AR 146.

[159] AR 147.

[160] AR 147-148.

her mother and was driven there by her son.[161] It was a 17-hour trip and she stayed for a week and did not do much other than visit with her mother.[162]

Plaintiff testified that she had not had carpal tunnel surgery yet because the workers compensation carrier had not approved it yet.[163] She said that there was a recent x-ray of her right shoulder that showed bone spurs.[164] She said she is limited in doing housework because of her shoulder and wrists.[165] She said she can only vacuum for a few minutes, has trouble making the bed, and has trouble kneeling or lifting even a gallon of milk.[166] She said she cannot use a computer or write for more than a few minutes and washing dishes makes her hands cramp but she has no trouble walking or standing.[167] She can sit for 4 hours.[168] There are days where she cannot answer her phone or attend appointments on a bad day and she

---

[161] AR 148-149.

[162] AR 149.

[163] AR 150.

[164] *Id.*

[165] AR 151.

[166] AR 151-152.

[167] AR 153-154.

[168] AR 154.

has about 7 bad days a month.[169] She said she will leave home occasionally but does not like to be around others for more than a half hour.[170]

Plaintiff said she got a temp job because she was able to pick days she did not want to work and just call out.[171] She said for the other job she just picked up trash with a stick and put it in a bag.[172] She said she last drank years ago and last used substances July 17, 2022.[173] She said she never used meth until after she had a breakdown in 2015 and was sober but never attended a 12-step program.[174] She was receiving $400 a month from DHS, $219 from workers compensation, and $289 in food stamps.[175] She can take care of her personal care although she does not do hair and makeup, can use a fork, can pick up a coin, and can use buttons and zippers.[176]

---

[169] AR 154-155.

[170] AR 155-156.

[171] AR 156.

[172] AR 157.

[173] *Id.*

[174] AR 157-158.

[175] AR 158-159.

[176] AR 159-160.

4. <u>Analysis</u>

It is of note that the ALJ articulated his reasoning as to ARNP Koomen's and ARNP Burbank's opinions regarding physical limitations separately from his articulated reasoning as to their opinions regarding mental limitations. The Court will address the ALJ's reasoning in a similar fashion.

a. *<u>The ALJ's consideration of ARNP Koomen's opinions regarding Plaintiff's exertional limitations</u>*

The ALJ articulated his consideration of ARNP Koomen's opinions as follows:

> In October 2019, Anne Koomen, ARNP, provided an assessment regarding the claimant's physical conditions. She indicated the claimant could sit for eight hours during an eighthour workday and stand and/or walk for eight hours during an eight-hour workday, but would need two to three unscheduled breaks of 10 to 15 minutes. She also stated the claimant could frequently lift at all weight levels (up to 50 pounds), did not have any limitations regarding doing repetitive reaching, handling, or fingering, and did not have any limitations with gross or fine manipulation, but would be absent more than four times a month (Exhibit B-24-F).
>
> I find Ms. Koomen's opinion persuasive [sic]. First, the opinion contains no rationale or explanation for her assertions. Specifically, the only diagnosis that Ms. Koomen listed in her opinion was bipolar disorder, which would not justify any of her physical limitations. Second, her opinion is not consistent with the longitudinal evidence discussed above, which shows that her right shoulder improvement had improved with treatment. Third, Ms. Koomen's opinion is contrary to the contemporaneous opinion of Brittany Yahruas, PAC, who concluded that the claimant "is cleared to be returned to work on normal duty from an orthopedic standpoint" (Exhibit B-9-F, p. 102). Because Ms. Yahrau's opinion, unlike Ms. Koomen's opinion, is

1
2

supported by examination findings, I find the former opinion more persuasive.[177]

3
4
5
6
7
8
9

Plaintiff argues that the ALJ's reasoning is flawed because he rejected ARNP Koomen's opinions that Plaintiff would require unscheduled breaks of 10 to 15 minutes and would be absent more than 4 days a month for reasons related to physical impairments when ARNP Koomen intended those limitations to be in place due to mental health issues.[178] The Commissioner argued in part that ARNP Koomen found Plaintiff to have bipolar disorder but "somehow still assessed physical limitations."[179]

10
11
12
13
14
15
16

The form on which ARNP Koomen expressed the opinions was titled "Physical Assessment."[180] As noted by the ALJ, ARNP Koomen opined that Plaintiff's sole diagnosis was bipolar disorder and that her symptoms would frequently interfere with her ability to concentrate and maintain attention.[181] ARNP Koomen opined that Plaintiff would not need to rest or lay down in excess of her typical breaks, that Plaintiff had no limitations in walking, could sit and stand for the maximum 8 hour in a regular workday, and could lift and carry at all levels

17
18
19
20
21
22
23

---

[177] AR 28.

[178] ECF No. 8.

[179] ECF No. 9, pg 5.

[180] AR 2274-2275.

[181] AR 2274.

of exertion.[182]  ARNP Koomen opined that Plaintiff would need to take 2 or 3 unscheduled breaks a day and would be absent more than four times a month.[183] She checked a box on the form that the limitations listed were reasonably consistent with Plaintiff's physical impairments plus any emotional impairments.[184]

The Court rejects the Commissioner's argument that ARNP Koomen improperly opined as to Plaintiff's physical limitations for three reasons.  First, the Commissioner has offered no evidence that ARNP Koomen's scope of practice is limited to psychiatry and that there is any reason she would not be capable of assessing physical limitations.  Additionally, when the form is read in its proper context, the limitations indicated as to the need for frequent breaks is clearly due to Plaintiff's bipolar disorder because it plainly states that she has no need of extra breaks due to her physical impairments.[185] Lastly, when read in proper context, ARNP Koomen's opined limitations make clear that she assessed no exertional impairments but indicated that there was a need for excessive absence due to the mental impairments.

---

[182] Id.

[183] AR 2274-2275.

[184] AR 2275.

[185] AR 2274.

1

        *b.*    <u>*The ALJ's consideration of ARNP Burbank's opinions regarding*</u>

2

        <u>*Plaintiff's exertional limitations*</u>

3

        The Court also finds that the ALJ failed to properly consider ARNP

4

Burbank's opinions regarding Plaintiff's physical conditions.  The ALJ articulated

5

his consideration of ARNP Burbank's opinions as follows:

6

7

8

9

10

11

12

13

> In May 2023, Patricia J. Burbank, ARNP, completed a form regarding the claimant's physical and mental conditions and functioning. In regard to the claimant's physical conditions and functioning, she stated the claimant has neuropathy pain in her hands and osteoarthritis of the right shoulder. She stated the claimant has numbness and pain in both hands and both wrists. She stated working on a regular and continuous basis would cause the claimant's conditions to deteriorate, as repetitive work with her hands and wrists could increase numbness, tingling, and pain. She stated that if the claimant attempted to work a 40-hour week, she would likely miss at least four days of work per month and would be off-task more than 30 percent of the time. She also checked a box indicating the claimant is limited to sedentary work, but also indicated the claimant could occasionally reach, handle, and finger with her right upper extremity (Exhibit B-43-F).

14

15

16

17

18

19

20

> In [sic]  find Ms. Burbank's opinion unpersuasive. Notably, she acknowledges she had only first seen the claimant a few months before providing this assessment and does not provide any objective support or explanation for her assessed limitations. Notably, she does not explain how the claimant's shoulder, hand, and wrist issues would limit her to sedentary work or prevent her from working full-time or staying on task. Her opinion that the claimant is limited to sedentary work is also not consistent with information provided by the claimant, who has indicated she has no difficulty standing or walking. Furthermore, the limitations she describes are not consistent with the record as a whole, which does not contain any information to suggest the claimant's upper extremity issues prevent her from standing or walking or from working full-time or from staying on-task. For these

21

22

23

DISPOSITIVE ORDER - 34

1    reasons, I find her opinion regarding the claimant's physical capacity
2    unpersuasive.[186]

3        The ALJ focused on the consistency of ARNP Burbank's opinions with an
4    allegation that Plaintiff could walk or stand for less than 8 hours.[187] But ARNP
5    Burbank initialed a box indicating that Plaintiff was limited to sedentary work
6    because she could "lift 10 lbs. maximum and frequently lift and/or carry articles
7    such as dockets, ledgers and small tools."[188] Moreover, ARNP Burbank indicated
8    that Plaintiff could only occasionally use her right upper extremity due to right
9    shoulder pain and bilateral hand pain and neuropathy.[189]

10        The Court additionally concludes that the ALJ failed to properly consider the
11    consistency factor of ARNP Burbank's opinions.  The opinions were rendered in
12    May 2023, and less than two months later in July 2023, objective testing was
13    performed that established Plaintiff suffers from moderate to severe median
14    neuropathy in the left wrist, mild right median neuropathy to the right wrist, and
15    ulnar neuropathy in the left elbow.[190]  Because carpal tunnel syndrome and cubital
16    tunnel syndrome are experienced as a gradual and progressive onset, absent

17    _____

18    [186] AR 29.

19    [187] *Id.*

20    [188] AR 3549.

21    [189] *Id.*

22    [190] AR 3978-3988.

23

evidence of a trauma to the arm, it is virtually certain that Plaintiff was suffering at least some effect of those conditions in May 2023, when ARNP Burbank rendered her opinions.

The regulations are clear that the ALJ is required to consider and articulate his reasoning both as to the supportability factor *and* the consistency factor.[191] Here, the ALJ's reasoning is lacking as to both.

        *c.*     <u>*The ALJ's consideration of ARNP Koomen's opinions regarding Plaintiff's psychiatric limitations*</u>

The ALJ articulated the following reasoning regarding his consideration of ARNP Koomen's opinions regarding Plaintiff's mental-health limitations:

> In October 2019, Anne Koomen, ARNP provided an opinion regarding the claimant's mental conditions (Exhibits B-24-F, B-25-F). She stated the claimant has bipolar disorder that causes symptoms that would frequently be severe enough to interfere with her attention and concentration required to perform simple work-related tasks (Exhibit B24-F, p. 2). She also indicated the claimant has no limitations in her ability to follow and carry out simple instructions, recognize a mistake and correct it, or identify and solve problems. She stated the claimant is moderately limited in her ability to sequence multistep activities and use her reason and judgment to make work-related decisions. She stated the claimant is moderately limited regarding concentration, persistence, or maintaining pace. She stated the claimant is markedly limited in her ability to adapt to changes and mange her psychologically based symptoms, but otherwise no more than mildly limited in her ability to adapt and mange herself. In regard to the claimant's ability to interact with others, she stated the claimant is not limited in her ability to cooperate with others, ask for help when needed, handle conflicts with others, and understand and respond to social cues, is mildly to moderately limited in her ability to respond to requests, suggestions, criticism, correction, and challenges, and has a

---

[191] 20 C.F.R. §§ 404.1520c(b)(2); 416.920c(b)(2); *Woods v. Kijakazi*, 32 F.4th a at 785.

variable ability (no limitation to extreme limitation) to keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness (Exhibit B-25-F). Ms. Koomen supported these opinions by noting the claimant was currently clean from drugs, but that her drug use in the past has impacted her decision making and that the claimant's bipolar disorder affected her mood which, in turn, affecting her functioning (Exhibit B25-F, pp. 2-4).

I find Ms. Koomen's opinion somewhat persuasive, as she has provided some brief explanations to support her findings, which are somewhat consistent with the record as a whole. Her opinion, however, reflects limitations somewhat more restrictive than the limitations shown by the current evidence. Notably, her opinion that the claimant is markedly limited in her ability to adapt to changes and manage psychologically based symptoms and may have extreme limitations in her ability to handle social interactions is not consistent with the claimant's mental status examinations, course of treatment, and daily functioning. As discussed above, treating notes, show that when the claimant is compliant with her medication regimen and with recommendations from her treating providers, she is fairly stable and is able to function reasonably well (see Exhibit B-33-F, pp. 2, 9, 13; Exhibit B-34-F, pp. 27, 31; Exhibit B-36-F, p. 27; Exhibit B-38-F, p. 221; Exhibit B-41-F, p. 11; Exhibit B-44-F, pp. 3, 8, 19). Indeed, when compliant, mental status examinations are largely unremarkable (Exhibits B-4-F, B-10-F, B-18- F, B-30-F, B-34-F, B-36-F, B-39-F), with the claimant typically described as presenting as calm, fully oriented, with normal mood and affect, good insight, and normal recent and remote memory (see, e.g., Exhibit B-36-F, pp. 7, 12; Exhibit B-37-F, pp. 25, 32, 36, 39; Exhibit B-44-F, pp. 4, 17, 39; Exhibit B-46-F, pp. 3, 10, 21, 29) and with clear and articulate speech, linear, logical and goal-directed thought process, no paranoia, and no evidence to indicate she is responding to internal stimuli (Exhibit B-38-F, pp. 4-5, 231). The overall evidence does not corroborate Ms. Koomen's assessment of marked mental/extreme mental limitations.[192]

---

[192] AR 30-31.

1
2
3
4
5
6

The Court notes that the ALJ has not addressed the consistency of ARNP Koomen's opinions with those of ARNP Burbank, Dr. Patterson, and Dr. Uhl that working would cause Plaintiff's condition to deteriorate because even minor stressors can trigger her.[193] The examining sources all opined that Plaintiff's bipolar cycles, although generally stable when properly managed by medication, were subject to fairly extreme mood shifts when stressors were added.[194]

7
8
9
10
11
12
13

In January 2021, when admitted to the Clallam County Jail, prison hospital staff noted that Plaintiff presented with an unstable mental state with highly emotional behavior and rapid and severe emotional shifts, and paranoid delusions and that her state was not drug related.[195]  It is of note that in March 2021, while still incarcerated and abstinent from illicit substances and being properly medicated, Plaintiff continued to display symptoms of a manic episode with psychosis when under stress and required additional medication.[196]

14
15
16
17
18

The Ninth Circuit has held that in regard to mental health issues, and bipolar disorder specifically, cycles of improvement and debilitating symptoms are

19
20
21
22
23

---

[193] AR 3548, 4192.

[194] *Id*.

[195] AR 2393.

[196] AR 2384.

a common occurrent and it is error for an ALJ to focus on evidence of improvement while ignoring other evidence of exacerbation in the same record.[197]

The Court concludes that the ALJ failed to adequately consider the waxing and waning nature of Plaintiff's condition when considering the medical opinions and failed to adequately consider the supportability and consistency factors.

5.    Summary

Because the ALJ failed to properly consider the consistency and supportability of the medical opinion evidence, a remand for further proceedings is warranted.

**B.    Plaintiff's Subjective Complaints: The Court finds the issue moot.**

Plaintiff argues the ALJ failed to properly evaluate her testimony. As discussed above, the ALJ failed to properly consider the medical opinion evidence. Because the Court has remanded the case for consideration of the record as a whole, the Court finds this issue is moot.

**C.    Remand for Further Proceedings**

Plaintiff submits a remand for payment of benefits is warranted. The decision whether to remand a case for additional evidence, or simply to award

---

[197] *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014), quoting *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

benefits, is within the discretion of the court."[198] When the court reverses an ALJ's decision for error, the court "ordinarily must remand to the agency for further proceedings."[199]

The Court finds that further development is necessary for a proper disability determination.

### IV.    Conclusion

Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED**, and this matter is **REMANDED** to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

2.    The portion of the ALJ decision which awarded benefits after July 1, 2023, shall remain in full force and effect, and the ALJ is only to consider that portion of the decision that found Plaintiff not disabled prior to July 1, 2023.

---

[198] *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing *Stone v. Heckler*, 761 F.2d 530 (9th Cir. 1985)).

[199] *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017); *Benecke* 379 F.3d at 595 ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014).

1        3.       The Clerk's Office shall **TERM** the parties' briefs, **ECF Nos. 8 and 9**,

2        enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

3        IT IS SO ORDERED. The Clerk's Office is directed to file this order and

4    provide copies to all counsel.

5        DATED this 26th day of February, 2025.

6

7        _____
         EDWARD F. SHEA
         Senior United States District Judge